[DO NOT PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 21-13400

————————————————

RICKEY LEE CHRISTMAS,

Plaintiff-Appellee,

*versus*

CORIZON HEALTH SERVICES, et al.,

Defendants,

DOCTOR RODRIGUEZ,
DOCTOR GOMEZ,

Defendants-Appellants.

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:17-cv-01183-KKM-SPF

_____

Before WILSON, BRANCH, and LAGOA, Circuit Judges.

PER CURIAM:

This is an appeal from a deliberate indifference claim stemming from Plaintiff-Appellee Rickey Lee Christmas's time as a pretrial detainee at Polk County's South Jail. Christmas's claim was that he was in severe pain and discomfort because of hernias and a malfunctioning colostomy, but that he was treated, for the most part, only with Tylenol. The jury found that two doctors—Christmas's treating physician, Luis Rodriguez, and the site medical director, Margie Gomez (together, the Defendants-Appellants)—were deliberately indifferent to his medical needs. On the claim against Dr. Rodriguez, the jury awarded $100,000 in compensatory damages and $300,000 in punitive damages. And on the claim against Dr. Gomez, the jury awarded $50,000 in punitive damages. After careful review, and with the benefit of oral argument, we affirm.

## I.        FACTUAL AND PROCEDURAL BACKGROUND

Because this case comes to us after a jury trial, we summarize the facts based on the evidence presented at trial.

In early 2015, Christmas spent several months in the hospital after intruders broke into his home and shot him with a sawed-off shotgun. He underwent four surgeries, including one to place a temporary mesh on his stomach and another to perform a colostomy. While many of the bullet fragments were removed from his body (approximately 50 to 75), some could not be removed and remained in his back. After his discharge from the hospital, Christmas continued to undergo treatment. He was prescribed pain medications, including oxycodone.

A month later, Christmas had another follow-up appointment. He was under the impression that he would have his colostomy reversed at that time. But before the appointment, Christmas was arrested and booked into South Jail in April 2016. South Jail is staffed with physicians from a private company called Corizon Health Services. Corizon's treating physician at South Jail was Dr. Rodriguez, and Dr. Rodriguez's supervisor was Corizon's site medical director, Dr. Gomez.

Christmas's initial medical screening at South Jail showed that he had bullet fragments in his body, a colostomy bag, and multiple hernias. As a result, he was placed in the medical ward where he lived for about two years. Early on, Dr. Rodriguez learned that Christmas's surgeon had been considering a colostomy reversal around the time of his arrest.

During his time at South Jail, Christmas complained repeatedly—at least 29 times—that he was in excruciating pain. The

district court's opinion included a table summarizing those complaints:

| Date | Complaint |
|---|---|
| 4/25/16 | "Both feet hurt pretty bad and my left lower back, my thighs, and my legs, they're numb." |
| 4/27/16 | "I have bullets in my back and it's causing my legs to retain water. I need pain medication and my anxiety medication." |
| 5/2/16 | "I need my pain meds renewed. And also I need anxiety medication, I can't sleep. Having bad dreams." |
| 5/6/16 | "I have hernias and also my stomach has a bad reaction to spicey food and also creates gas. Can I be put on a spicey diet regimen. I also would want to raise the times I get my pain meds or be put back on something." |
| 6/20/16 | "I need my pain medication renewed. I am also constipated, I need to be back on my high fiber diet." |
| 9/24/16 | Requested more Tylenol. |
| 9/30/16 | "I need my meds renewed, please, Tylenol and all the rest." |
| 12/1/16 | "Surgery to remove colostomy and restore intestinal tract to original configuration. Surgical removal of bullets, metal fragments near spine, gut, and repair of damaged hernia repair." |
| 12/21/16 | "I'm still in pain, my back, and when I eat beans, I'm bleeding. The beans stop me up and hurt bad. Please help." |
| 1/11/17 | "I have a lot of bullets in my back that needs to come out and I'm in a lot of pain." |

| | |
|---|---|
| 1/15/17 | "My back hurts and numb [sic] and my leg burns." |
| 1/21/17 | "My back needs the bullets taken out. I need pain meds." |
| 2/14/17 | "My body aches, my head is stopped up, and I got the flu bug." |
| 2/24/17 | "I still got a cold and the back of my head hurts and my [whole] body." |
| 3/11/17 | "Bad headaches and sneezing and my back hurts." |
| 5/30/17 | "I have a sharp pain right behind my colostomy bag. I can't breathe and I'm not pooping like I was." |
| 6/10/17 | "Rolled out of bed on my back, I hurt all over." |
| 7/1/17 | "My hernia hurts and the back of my neck." |
| 7/19/17 | "My neck, my back, and my stomach hurts, constant pain." |
| 7/26/17 | "My neck and my head hurts." |
| 8/2/17 | "I'm in pain all the time. In fact, the whole time I've been here, my back where the bullets are, the back of my legs, and my stomach. I need pain meds the rest of the time I'm here until you send me to an outside doctor to get fixed." |
| 8/15/17 | "My back and my back of my leg is hurt all the way to my feet, left side." |
| 8/23/17 | "Bulging hernia, excruciating pain, remove colostomy bad [sic] and restore intestinal tract, remove metal bullets from stomach and spine, excruciating pain." |
| 9/13/17 | "I have a colostomy, but I'm pooping out my butt. I've never done this before and I've had my colostomy two years. It was supposed to be reversed a year ago." |

| 9/23/17 | "My back is numb where the bullets are and my hernia hurts. I need something for pain. I would also like to see an outside doctor. Thank you." |
| 10/9/2017 | "I have a bump in my mouth. Tell me what it is. And I'm still in pain from the bullets in my back. Can I get another out, please." |
| 10/14/17 | "My hernia mesh tore and is hurting. It's old and needs to be removed." |
| 10/18/17 | "I'm stopped up, I can't poop right for four days. The two days I passed out and went to medical. I am sour on my stomach and it's red and looks like bleeding or treating. I need to see an outside doctor before the infection spreads. No blood was drawn and my stomach is getting bigger. Send me to an outside doctor, please before I get sick and die." |
| 10/28/17 | "Stomach still hurting real bad burning on the outside is swollen, red. Please help, something is not right with this colostomy bag." |

Much of the pain Christmas complained of was caused by his hernias and his colostomy. The hernias protruded from his stomach, and some grew to the size of a golf ball. As for the colostomy, it was functional at times, but at other times Christmas complained that it was malfunctioning. He stressed that he was long overdue for a colostomy reversal surgery.

In response, Dr. Rodriguez prescribed only Tylenol, anti-depressants, and anti-anxiety medications. At trial, Christmas testified that these medications did little to help. Christmas testified that Dr. Rodriguez once told him that "the body can take quite a

bit of pain." Another time, Christmas was in so much pain that he blacked out in front of Dr. Rodriguez, after which he was simply told to rest. In response to his complaints, medical staff told Christmas that South Jail does not treat chronic pain and does not pay for surgeries that are not emergent.

Specific to Dr. Gomez's involvement, Christmas testified that he verbally complained to her about his pain when she visited South Jail. According to Christmas, she did not give him the help he needed. Dr. Gomez testified that she never treated Christmas and was never involved in his care. Although there are treatment orders and prescriptions for Tylenol bearing Dr. Gomez's name, she testified at trial that her name appeared on his orders solely based on Corizon's protocol.

In May 2017, Christmas filed suit against Corizon and several of its physicians, including Drs. Rodriguez and Gomez, under 42 U.S.C. § 1983. He alleged deliberate indifference to his serious medical needs. The claims focused on his care from December 2016 to November 2017.

Not long after Christmas sued, he was referred to Dr. Janet Skarda. Her examination revealed that Christmas had a "large central abdominal hernia." Dr. Skarda discussed surgical options with Christmas, including colostomy reversal and hernia repair. After another follow up visit, Dr. Skarda eventually performed the colostomy reversal and hernia repair in February 2020. Surgery was successful. At a follow-up visit, Christmas reported that his pain was greatly reduced and that he was no longer taking over-the-counter

pain medication.  In terms of the timing of Christmas's surgery—and why Dr. Skarda did not operate sooner—she testified that she had no control over scheduling.

In April 2021, Christmas's case proceeded to a jury trial on his claims against Drs. Rodriguez and Gomez.  At the final pretrial hearing, the district court allowed Christmas to add a theory of supervisory liability against Dr. Gomez.  Shortly after, the district court also allowed Christmas to add claims for punitive damages.

After a three-day trial, a jury found that the Defendants were deliberately indifferent to Christmas's serious medical needs and awarded $100,000 in compensatory damages and $300,000 in punitive damages as to Dr. Rodriguez, as well as $50,000 in punitive damages as to Dr. Gomez.  The jury verdict did not specify whether Dr. Gomez was liable under a theory of direct or supervisory liability.  In a thorough 41-page order, the district court denied the Defendants' Rule 50 motion, finding that the evidence supported the verdict.  The Defendants appealed the denial of that motion, and also appealed the district court's decision to allow claims for supervisory liability and punitive damages.

## II.    STANDARD OF REVIEW

We review de novo the denial of a motion for judgment as a matter of law, viewing the evidence in the light most favorable to the nonmoving party.  *Salvato v. Miley*, 790 F.3d 1286, 1292 (11th Cir. 2015).  We review for abuse of discretion the district

21-13400                Opinion of the Court                    9

court's decision to grant leave to amend the complaint. *See Foman v. Davis*, 371 U.S. 178, 181 (1962).

## III.    DISCUSSION

Our discussion divides into two parts.  We first address the Defendants' argument that the evidence was insufficient to support the jury's verdict, thus entitling them to judgment as a matter of law.  Second, we address the Defendants' argument that the district court abused its discretion by allowing Christmas to assert a theory of supervisory liability and to seek punitive damages.

### A.    *Did the District Court Err in Denying Judgment as a Matter of Law?*

The Defendants contend that there was insufficient evidence to support the jury's finding that they violated Christmas's Fourteenth Amendment right to due process by showing deliberate indifference to his serious medical needs.[1]  Christmas alleged that Dr. Rodriguez was deliberately indifferent in his individual capacity, and that Dr. Gomez was deliberately indifferent in her individual and supervisory capacities.

A deliberate indifference claim has "both an objective and a subjective inquiry." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir.

---

[1] As a pretrial detainee, Christmas's rights arose under the Fourteenth Amendment rather than the Eighth Amendment, but the standard we apply is the same in either context. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013).

2003).  A plaintiff must first show "an objectively serious medical need."  *Id.*  "Second, a plaintiff must prove that the prison official acted with an attitude of 'deliberate indifference' to that serious medical need."  *Id.*

### 1.    *Serious Medical Need*

On the first prong, a serious medical need can be either "one that has been diagnosed by a physician as mandating treatment or," as relevant here, "one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Id.* "The medical need," we have explained, "must be one that, if left unattended, poses a substantial risk of serious harm."  *Id.* (cleaned up).  We have also held that "[s]evere pain that is not promptly or adequately treated can . . . constitute a serious medical need depending on the circumstances."  *Melton v. Abston*, 841 F.3d 1207, 1222 (11th Cir. 2016) (per curiam).

The Defendants argue that Christmas did not have an objectively serious medical need that posed a substantial risk of harm if left unattended.  *See Farrow*, 320 F.3d at 1243.  To the contrary, they say, all the medical evidence established that Christmas's conditions were nonemergent.

Viewing the evidence in the light most favorable to Christmas, however, as we must, we find that the evidence was sufficient to show that he had an objectively serious medical need.  From the time Christmas arrived at Jail South, he had a colostomy bag and hernias.  During the relevant period, Christmas complained

repeatedly about the colostomy bag causing him pain and discomfort. Christmas testified that wearing the bag was uncomfortable and made him self-conscious. Even worse, it sometimes malfunctioned, as Christmas explained in several complaints to the jail.

Christmas's hernias also caused him to suffer. The hernias, he testified, grew increasingly bigger as his abdominal mesh deteriorated. The largest of the hernias caused a golf-ball-sized bulge in his stomach. He often reported that the hernias were quite painful, and it is undisputed that the only way to fix the hernias was to operate. Even if the need for surgery was nonemergent, a reasonable jury could have found that the hernias constituted a serious medical need that required treatment.

The evidence, then, was sufficient to establish that Christmas had serious medical needs that were "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow*, 320 F.3d at 1243.

### 2.    Deliberate Indifference

On the second prong, to prove that the Defendants were deliberately indifferent in their individual capacities, Christmas had to prove: "(1) [the doctors'] subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Melton*, 841 F.3d at 1223. Examples of deliberate indifference include: "(1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all."

*Id.* "[E]ven where medical care is ultimately provided," we have held, "a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *Farrow*, 320 F.3d at 1246 (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). On this prong, it helps to separate Dr. Rodriguez's liability from that of Dr. Gomez.

### a.    Dr. Rodriguez's Liability

Dr. Rodriguez argues that he was not deliberately indifferent because, as South Jail records show, he gave Christmas treatment. Although he did not prescribe narcotics, he says that decision was justified for at least two reasons. Namely, narcotics are too risky to administer in a jail setting, and Christmas could not have tolerated them since he has only one kidney.

After reviewing the record, however, we find the evidence was sufficient to support the jury's finding. During the relevant period, Christmas's complaints to Dr. Rodriguez were numerous and repeated—both about his colostomy bag and his hernias. Once, Christmas's pain even caused him to black out in Dr. Rodriguez's office. Yet Christmas testified that Dr. Rodriguez did little to help. True, Dr. Rodriguez administered *some* treatment, such as Tylenol. But given the nature of Christmas's suffering, the jury could have concluded that it was "so cursory as to amount to no treatment at all." *See Melton*, 841 F.3d at 1223.

Even crediting Dr. Rodriguez's argument that narcotics were not an option, a reasonable jury could have found that Dr. Rodriguez should have referred Christmas to Dr. Skarda earlier. Dr. Rodriguez knew Dr. Skarda had been considering operating on Christmas at the time of his arrest. He heard Christmas complain repeatedly about pain and discomfort. Yet he delayed in referring Christmas to Dr. Skarda. Once Dr. Skarda was able to operate on Christmas's hernias and colostomy, his pain was significantly reduced. A reasonable jury could have believed, based on this evidence, that Dr. Rodriguez's delay in referring Christmas to a surgeon was constitutionally intolerable.

A reasonable jury, then, could have found that Dr. Rodriguez knew about Christmas's serious medical need, that Dr. Rodriguez disregarded that risk by failing to refer him for evaluation, and that the conduct went beyond mere negligence.

### b.    Dr. Gomez's Liability

Dr. Gomez argues that she cannot have been deliberately indifferent because she neither participated in Christmas's care nor instigated a policy that violated his constitutional rights.

We start with Dr. Gomez's individual liability. For three reasons, the jury could have found that Dr. Gomez knew about Christmas's medical needs and that she was involved in his care. First, Dr. Rodriguez, who was familiar with Christmas's medical needs, testified that he communicated regularly with Dr. Gomez about patients. Second, Christmas testified that he complained

directly to Dr. Gomez multiple times.  And third, Dr. Gomez signed an affidavit stating that she would have entered orders for Christmas if she thought he needed additional care, allowing the jury to infer that she was personally involved in Christmas's care.

The evidence also established that Dr. Gomez had "final responsibility for making or approving all medical decisions regarding the care provided to inmates in the [South] Jail."  As a result, the jury could have found that Dr. Gomez, despite knowing about Christmas's condition and that surgery was being considered, decided to treat him mainly with Tylenol rather than provide the treatment he needed.  The evidence was thus sufficient to support a finding of individual liability, not only as to Dr. Rodriguez, but also as to Dr. Gomez.

And in any event, the evidence also supported Dr. Gomez's supervisory liability.  Although there is no vicarious liability under § 1983, plaintiffs can sue under a theory of supervisory liability.  To establish supervisory liability, a plaintiff must show either (1) that the supervisor "personally participate[d] in the alleged constitutional violation" or (2) that there is a "causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007).  A causal connection is shown when:

> 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate

indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so.

*Id.* (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010)).

At a minimum, the evidence was sufficient here to show that Dr. Gomez's "custom or policy result[ed] in deliberate indifference to [Christmas's] constitutional rights." *Id.* Dr. Gomez was the site medical director, meaning she was responsible for approving South Jail's policies. And Christmas was told several times that South Jail's policy was not to treat chronic pain. In fact, as the district court pointed out, a written response to one of Christmas's grievance forms informed him: "As I am sure that my medical staff has told you before, we do not treat chronic pain." Moreover, Christmas was told that South Jail's practice was not to pay for nonemergent surgeries. Again, a written document—in this case a nurse's report—confirmed that South Jail communicated this policy to Christmas.

Based on this evidence, the jury could have reasonably inferred that Dr. Gomez was responsible for policies at South Jail, and that those policies resulted in deliberate indifference. Accordingly, we affirm on this issue.

B.      *Did the District Court Abuse Its Discretion by Allowing a*
         *Theory of Supervisory Liability and Punitive Damages?*

The Defendants also argue that the district court erred by allowing Christmas to amend his pleadings on the eve of trial. Christmas, they contend, didn't bring up punitive damages or supervisory liability until just before trial. As a result, the Defendants say they were not on notice of these claims in time to prepare a defense. Christmas responds that the Defendants were not prejudiced by the late amendments.

Even during trial, a district court "should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." Fed. R. Civ. P. 15(b)(1). In denying the Defendants' motion for new trial, the district court stressed that the Defendants—whether "prior to trial, during trial, or even . . . in their motion for a new trial"—never explained how they would be prejudiced. To explain how they were prejudiced, the district court reasoned, the Defendants would have to explain what evidence they would have sought in discovery or how they would have litigated the case differently if they'd been given earlier notice of Christmas's claims.

After careful review, we find no abuse of discretion here. The bottom line is that, as the district court explained, the Defendants never said how they would have litigated the case differently if they'd had more advance notice of Christmas's claim for

supervisory liability and punitive damages.  For that reason, they failed to show that they were prejudiced.  *See* Fed. R. Civ. P. 15(b)(1).

## IV.    CONCLUSION

In conclusion, the evidence supported the jury's verdict, and we find no abuse of discretion in the district court's permitting Christmas to amend his complaint.  Accordingly, we affirm.

**AFFIRMED.**